**IT IS ORDERED as set forth below:**


**Date: October 31, 2023**

_____

**Sage M. Sigler**
**U.S. Bankruptcy Court Judge**

_____




**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **In re:** | : | **CASE NUMBER:** |
| | : | |
| **KALOS CAPITAL, INC.,** | : | **22-58326-SMS** |
| | : | |
| Debtor. | : | Chapter 11 Subchapter V |
| _____ | : | |


<u>**MEMORANDUM OPINION**</u>

Debtor's principals propose to fund a Chapter 11 plan in exchange for third-party releases of themselves, former employees, and affiliated businesses. The releasee-funded plan and third-party releases are functionally similar to those in newsworthy mass tort bankruptcies. Unlike those cases, the case before the Court does not involve complicating factors such as unknown or future claimants or objecting creditors. Nonetheless, the United States Trustee objects to confirmation of

Debtor's otherwise consensual plan because of the releases. But the record establishes that the releases are appropriate under Eleventh Circuit law, and the Court will confirm the Plan.

**I.  <u>Introduction</u>**

Kalos Capital, Inc. ("Debtor"), the debtor and debtor in possession in this case under Subchapter V of Chapter 11 of the Bankruptcy Code, seeks confirmation of its *Second Amended Plan of Liquidation* (the "Plan," Doc. 93), as a consensual plan under 11 U.S.C. § 1191(a). At the confirmation hearing on August 29, 2023 (the "Confirmation Hearing"), Debtor's counsel proffered the testimony of Carol Wildermuth, Debtor's CFO, regarding compliance with the applicable confirmation requirements of 11 U.S.C. § 1129.[1]

The only opposition to the Plan is the United States Trustee's *Objection to Confirmation of Plan* (the "Objection," Doc. 114), opposing the Plan's release of non-debtor parties (the "Released Parties") from liabilities arising from or in connection with Debtor, its business operations, or its bankruptcy case (the "Releases"). The United States Trustee (the "UST") conceded that the Plan meets all other confirmation requirements, and no other party in interest objected to the Releases or any other aspect of the Plan. The Court, having heard the proffer at the Confirmation Hearing, and having reviewed the Plan and the record in this Case, concludes that Debtor has met all other applicable requirements of confirmation under § 1129.

For the reasons set forth below, the Court concludes that the Releases contained within the Plan are fair, equitable, and in compliance with applicable statutory provisions and Eleventh Circuit law. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law with respect to the UST's Objection to the Releases;[2] the Court will confirm Debtor's Plan

---

[1] All statutory references are to the Bankruptcy Code (11 U.S.C. § 101 *et. seq.*) unless otherwise noted.

[2] Any findings of fact that are more properly construed as conclusions of law shall be so construed, and vice versa.

by separate order.

## II. **Background**

### A. *Debtor's History*

Prior to its filing, Debtor was a securities broker-dealer registered with the Securities and Exchange Commission (the "SEC") and a member of the Financial Industry Regulatory Authority ("FINRA"). Among Debtor's offerings were non-public investments in entities related to GPB Capital Holdings, LLC ("GPB"). In June 2018, GPB was unable to complete its financial audits and failed to file a timely registration statement with the SEC.

In the second half of 2019, Debtor began receiving arbitration demands related to the GPB offering. In the three years prior to this bankruptcy filing, several of Debtor's brokerage clients filed arbitration actions related to their GPB investments with FINRA Dispute Resolution Services. Although all arbitrations named Debtor as respondent, some also included Debtor's principals, Carol and Daniel Wildermuth (the "Wildermuths"), and Debtor's employees as respondents.

Unable to afford the increasing legal expenses associated with the arbitrations, Debtor decided to wind down its business, withdraw from FINRA, and liquidate its assets. Debtor filed this Chapter 11 case to effectuate an orderly liquidation.

### B. *The Bankruptcy Case*

On October 17, 2022 (the "Petition Date"), Debtor commenced this bankruptcy case under Subchapter V of Chapter 11 and filed an initial plan of liquidation. (Docs. 1, 15). The same day, Debtor initiated adversary proceeding no. 22-05149 (the "Injunction AP"), seeking to enjoin certain claimants from continuing to prosecute arbitration claims that either already named, or could have been amended to name, the Wildermuths as respondents. The Court entered a temporary restraining order and, after holding a trial, issued a preliminary injunction barring the

Injunction AP defendants from proceeding with their arbitration claims against the Wildermuths until the Court confirmed a plan or ordered otherwise (Injunction AP, Docs. 11, 25).

At the request of Debtor and several creditors, the Court entered an order authorizing the parties to mediate their disputes (Doc. 53). After a months-long mediation process between Debtor, the Wildermuths, and arbitration claimants holding over $6.7 million in filed claims, the Wildermuths agreed to contribute $1.3 million to the Plan (the "Contribution") to be distributed to creditors in exchange for a release of liabilities for themselves and the other Released Parties arising from or in connection with Debtor, its business operations, or its bankruptcy case (the "Settlement").

On July 7, 2023, Debtor filed the Plan, which incorporated the terms reached in the Settlement. Under the Plan, the creditors party to the Settlement (the "Settling Creditors") are classified into Class 3, separate from other general unsecured creditors in Class 2. The Class 3 Settling Creditors will receive $1 million of the Contribution, to be allocated amongst themselves, and will forego any further distributions from Debtor's estate. This aspect of the Settlement would reduce the face value of general unsecured claims against Debtor's estate from over $11 million to less than $5 million. The remaining general unsecured creditors, the vast majority of which are non-settling arbitration claimants, are treated in Class 2 of the Plan. The Class 2 general unsecured creditors will receive the remainder of the Contribution and Debtor's other available assets, which Debtor estimates will total approximately $1,175,000.

According to the Ballot Report (Doc. 112), all voting claim holders in each class voted to accept the Plan and no ballots rejecting the Plan were cast. All creditors eligible to vote in Class 1 (Debtor's former employees with priority claims), Class 3 (the Settling Creditors), and Class 4 (Debtor's equity holder) voted in favor of the Plan. Seventeen of the 38 eligible voters in Class 2

voted to accept the Plan, and the remaining 21 did not submit a ballot. Of the 21 non-voting Class 2 creditors, one ultimately withdrew its claim and eight are taxing authorities and ordinary course vendors or service providers not subject to the Releases.[3] Of the remaining 12 non-voting creditors, at least 11 were represented by legal counsel in this bankruptcy case, and none have asserted a claim against any of the Released Parties.

C. *The Releases*

In accordance with the terms of the Settlement, the Plan includes a release of liability for certain individuals in exchange for the Wildermuths' Contribution. The Plan defines the Released Parties as the Wildermuths and any of Debtor's current or former officers, directors, and employees, and any entities affiliated with or related to Debtor or the Wildermuths but does not include any agents or independent contractors that provided investment advice to Debtor's clients. Plan at 12. The Plan defines the Releasing Parties as Debtor and its estate, any bankruptcy trustees or other representatives of Debtor, and any holders of claims or interest, whether asserted or not. *Id.* At the Confirmation Hearing, Debtor narrowed the definition of the Releasing Parties to exclude the eight taxing authorities and ordinary course service providers.

Section 12.12 of the Plan provides for the following release:

> ONLY UPON THE FULL PAYMENT OF THE PLAN CONTRIBUTION AND THE SETTLEMENT CONTRIBUTION, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE RELEASING PARTIES, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER . . . WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY

---

[3] Upon questioning by the Court at the Confirmation Hearing, Debtor agreed to exclude these eight entities from the definition of Releasing Parties.

> STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, THAT SUCH HOLDERS . . . WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT . . . BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR, THE REORGANIZED DEBTOR, OR ITS ESTATE, THE CHAPTER 11 CASE, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE PLAN, THE PLAN DOCUMENTS . . . OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

Plan at 33-34. Section 12.13 of the Plan provides that the order confirming the Plan will act as an injunction against any collection activity against Debtor or Debtor's property and extends that injunction to the Released Parties. *Id.* at 34. In short, upon payment in full of the $1.3 million Contribution by the Wildermuths and consummation of the Plan, all claims relating to Debtor in any way will be released by the Releasing Parties.

D. *The UST's Objection to the Releases*

The UST objects to the Confirmation of Debtor's Plan on the bases that: (1) the Court does not have statutory authority to grant nonconsensual third-party releases; (2) granting the Releases would violate due process; and (3) Debtor failed to show the facts of the case warrant the granting

of the Releases under the *Dow Corning* seven-factor test adopted by the Eleventh Circuit in *Seaside*.[4] Objection at 9-12. For the reasons set forth below, the UST's Objection is overruled.

### III. <u>ANALYSIS</u>

#### A. *Statutory Authority*

The UST takes the position that the Court cannot confirm the Plan because § 524(e) "neither authorizes nor permits" the Releases. Objection at 10. The UST also argues that because § 524(e) "proscribes the discharge of non-debtors," the Plan does not comply with all "applicable provisions" of the Bankruptcy Code in violation of § 1129(a)(1). *Id.* at 9.

Circuits are split on whether bankruptcy courts have the authority to enjoin third-party claims against non-debtors as part of a Chapter 11 plan. The Fifth, Ninth, and Tenth Circuits, following reasoning consistent with the UST's position, prohibit nonconsensual third-party releases solely by their interpretation of § 524(e),[5] which states that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." Based on this section, Circuits prohibiting nonconsensual third-party releases reason that "Congress did not intend to extend such benefits to third-party bystanders," especially those that have not fully opened their books and records to their creditors, and insist that one must submit to the entire bankruptcy process to receive a discharge of their debts. *In re W. Real Estate Fund*, 922 F.2d at 600.

---

[4] *See Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648 (6th Cir. 2002); *SE Prop. Holdings, LLC v. Seaside Eng'g & Surveying (In Re Seaside Eng'g & Surveying)*, 780 F.3d 1070 (11th Cir. 2015).

[5] *See Bank of N.Y. Tr. Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 251-53 (5th Cir. 2009); *Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401-02 (9th Cir. 1995); *Landsing Diversified Props.-II v. First Nat'l Bank and Tr. Co. of Tulsa (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 600-02 (10th Cir. 1990).

The Eleventh Circuit and the majority of other circuits, including the Second, Seventh, and Sixth Circuits, do not interpret § 524(e) to bar such releases.[6] In *Seaside*, the Eleventh Circuit determined that although § 524(e) provides that the debtor's discharge of a debt does not affect a third party's liability on the debt, the section "says nothing about the authority of the bankruptcy court to release a non-debtor from a creditor's claims." *Seaside*, 780 F.3d at 1078. As aptly explained by the Seventh Circuit:

> [Section] 524(e) does not purport to limit the bankruptcy court's powers to release a non-debtor from a creditor's claims. If Congress meant to include such a limit, it would have used the mandatory terms "shall" or "will" rather than the definitional term "does." And it would have omitted the prepositional phrase "on, or . . . for, such debt," ensuring that the "discharge of a debt of the debtor shall not affect the liability of another entity"— whether related to a debt or not.

*Airadigm*, 519 F.3d at 656, *cited with approval in Seaside*, 780 F.3d at 1078. Courts have also distinguished releases such as those in the Plan from a discharge granted under § 524(e) by comparing the limited scope of the releases to the general discharge of liability afforded under § 524(e). *See, e.g., Purdue Pharma*, 69 F.4th at 70-71 ("While the Bankruptcy Code forbids a discharge of a non-debtor's claim under 11 U.S.C. § 524(e), the releases at issue on appeal do not constitute a discharge of debt for the [released parties] because the releases neither offer umbrella protection against liability nor extinguish all claims.").

In essence, the Eleventh Circuit reads § 524(e) to demarcate the effect of a discharge of a debtor's debt rather than to delimit a bankruptcy court's equitable powers relative to third parties. Thus, the Court concludes that § 524(e) does not preclude it from approving the Releases.

---

[6] *See, e.g., Seaside*, 780 F.3d 1070; *Purdue Pharma, L.P. v. City of Grande Prairie (In re Pharma L.P.)*, 69 F.4th 45 (2d Cir. 2023), *cert. granted sub. nom.*, *Harrington v. Purdue Pharma, L.P.*, No. 23-124, 2023 U.S. LEXIS 2872, 92 U.S.L.W. 3026, __ S.Ct. __, 2023 WL 5116031 (Aug. 10, 2023); *Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*, 519 F.3d 640, 656 (7th Cir. 2008); *Dow Corning*, 280 F.3d 648.

Having determined that the Bankruptcy Code does not preclude the Releases, the Court considers its affirmative statutory authority to grant the Releases. The Eleventh Circuit has held that § 105(a) provides bankruptcy courts equitable powers to confirm a plan containing nonconsensual third-party releases under appropriate circumstances. *Seaside*, 780 F.3d at 1078. Other courts have also found statutory authority for nonconsensual third-party releases in § 1123(b)(6), which provides that "a plan may . . . include any other appropriate provision not inconsistent with the applicable provisions of this title." *See Purdue Pharma*, 69 F.4th at 72-73 (concluding that the bankruptcy court can grant nonconsensual third-party releases under §§ 105(a) and 1123(b)(6)); *Airadigm*, 519 F.3d at 657 (holding that §§ 105(a) and 1123(b)(6) permit bankruptcy courts "to release third parties from liability to participating creditors if the release is 'appropriate' and not inconsistent with any provision of the bankruptcy code."); *Dow Corning*, 280 F.3d at 658 (concluding that an injunction barring a non-consenting creditor's claim against a non-debtor is appropriate pursuant § 1123(b)(6)).

In accordance with Eleventh Circuit precedent and the reasoning of the Second, Seventh, and Sixth Circuits, the Court concludes that it has the statutory authority under §§ 105(a) and 1123(b)(6) to grant nonconsensual third-party releases such as those included in the Plan.

### B. *Due Process*

In a single sentence, the UST argues that even if the Court has statutory authority to grant nonconsensual third-party releases, the Fifth Amendment's Due Process Clause "prohibits such a broad deprivation of the rights of third parties absent proper notice and a hearing." Objection at 10. The UST's due process concerns pertain to a hypothetical former client of Debtor who may

have a claim against the Released Parties, but who is not yet aware of such claim.[7] Procedural due process involves a two-part inquiry: (1) whether a party was deprived of a protected interest, and, if so, (2) what process was the party due. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1981).

The Releases would bar any cause of action against the Released Parties to the extent it arises from or in connection with Debtor's business or its bankruptcy case. Such causes of action are undoubtedly a constitutionally protected property interest. *Id.* ("a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause"). The question then is whether the hypothetical former client with a potential claim against the Released Parties was given adequate notice and the opportunity to be heard. *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). Due process requires notice that is (i) reasonably calculated to reach all interested parties, (ii) reasonably conveys the required information, and (iii) gives the parties reasonable time to respond. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

The proposed Releases have been a conspicuous feature of Debtor's bankruptcy case since day one. Debtor's initial plan, filed over a year ago along with Debtor's bankruptcy petition, included a release broader than the negotiated Release now before the Court. On multiple occasions, notices were sent via first class mail to all of Debtor's potential claimants, including all former customers, contract counterparties, and trade creditors, containing conspicuous language describing the nature of the Releases and entities that would be subject to them as required by Bankruptcy Rule 2002(c)(3).

---

[7] At the Confirmation Hearing, counsel for the UST was unable to describe with any specificity which former customers or other category of claimants may have unknown or future claims against the Released Parties, or the nature of those potential claims.

The first such notice titled *Notice of Chapter 11 Bankruptcy Case* contained the following, bolded, language and was served on well over 10,000 of Debtor's former customers, employees, and trade creditors:

> The Plan, among other things, proposes to make distributions on allowed claims. **The Plan includes a release of the Debtor and third parties related to the Debtor from any and all claims and causes of action that such holders would have been legally entitled to assert.** A copy of the Plan can be found at the Claims and Noticing Agent's website. PLEASE READ AND REVIEW THE PLAN CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED BY THE PLAN.

(Docs. 34, 35, 37, 42, 45, 52, 56, 61, 70, and 74) (emphasis added).

The second notice titled *Notice of (I) Deadline to Object to Plan of Liquidation; (II) Deadline for Casting Votes to Accept or Reject the Debtor's Plan of Liquidation, (III) the Hearing on Confirmation of the Plan; (IV) **Releases Contained Within Plan**; and (V) Certain Related Matters* (emphasis added) contained the following, bolded, language and was, again, served on over 10,000 of Debtor's former customers, employees, and trade creditors:

> [A]ny holder of a Claim or Interest against the Debtor, regardless as to whether that holder of a Claim or Interest against the Debtor has asserted such a Claim or Interest in the above-styled Bankruptcy Case or otherwise, will release Carol Wildermuth, Daniel Wildermuth, the Debtor and any of the Debtor's current or former officers, directors, employees, and any entities affiliated or related to the Debtor, or Carol or Daniel Wildermuth, regardless of whether those relationships are direct or indirect, from any and all claims and causes of actions including but not limited to, those related in any manner to the Debtor or its business. The full and complete release and related injunction is contained within the Plan, which may be obtained at https://cases.stretto.com/KalosCapital and is incorporated into this notice by reference.

(Doc 106).

Debtor provided notice of the Releases on at least two occasions to over 10,000 parties including all its former customers, employees, and trade creditors. As such, the Court finds that

the notices were reasonably calculated to reach all interested parties. Second, the Court finds that the notices reasonably convey adequate information to the Releasing Parties of what they are releasing. The notices highlighted and made clear that Debtor's Plan contained Releases affecting parties' claims as well as the nature of the claims subject to the Releases. Finally, the Court finds that any party affected by the Releases had reasonable time to respond. The second notice provided interested parties over 30 days to object to Debtor's Plan. Moreover, the Confirmation Hearing was adequately noticed and open to participation by any party in interest through the Court's Virtual Hearing Room. Any party who wished to be heard could have done so from the comfort of their home. Accordingly, the Court finds that notice of the Releases was adequate under the circumstances.

This is not a mass tort case with a specter of unknown potential and future claimants whose injury, whether economic or otherwise, has yet to manifest. *Cf. In re Purdue Pharma L.P.*, 633 B.R. 53, 58 (Bankr. S.D.N.Y. 2021) ("In a very real sense, every person in the range of the Debtors' opioid products, sold throughout the United States, was a potential creditor."). Debtor was a broker-dealer with a finite pool of potential claimants subject to the Releases—primarily former customers, all of whom are known and received notice of Debtor's bankruptcy case and the Releases. In this context, and based upon the record in this case regarding the pool of potential claimants of Debtor and the Released Parties, the Court's review of the notices disclosing the Releases and the documented service of the same, and the lack of any challenge to the sufficiency of such notices by any party in interest (including the UST), the Court concludes that the parties affected by the Releases were afforded due process.

C. _The Dow Corning Factors_

Notwithstanding the Court's authority to grant the Releases, the Eleventh Circuit has cautioned that nonconsensual third-party releases "ought not to be issued lightly[] and should be reserved for those unusual cases in which such an order is necessary for the success of the reorganization, and only in situations in which such an order is fair and equitable under all the facts and circumstances." *Seaside*, 780 F.3d at 1078; *see Dow Corning*, 280 F.3d at 658 ("Because such an injunction is a dramatic measure to be used cautiously, we follow those circuits that have held that enjoining a non-consenting creditor's claim is only appropriate in 'unusual circumstances.'"). In aid of making this determination, the Eleventh Circuit adopted the seven-factor test set forth by the Sixth Circuit in *Dow Corning*. Under this test, a bankruptcy court may enjoin a nonconsenting creditor's claims against a non-debtor if the following seven factors weigh in favor of granting the injunction:

(1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

(2) The non-debtor has contributed substantial assets to the reorganization;

(3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;

(4) The impacted class, or classes, has overwhelmingly voted to accept the plan;

(5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;

(6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and;

(7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*Id.* (quoted in and adopted by *Seaside*, 780 F.3d at 1079). Notably, in evaluating these factors, the Court has "discretion to determine which of the *Dow Corning* factors will be relevant in each case." *Seaside*, 780 F.3d at 1078. For the reasons set forth below, the facts of this case support approving the Releases as part of Debtor's Plan.

i.   <u>There is an Identity of Interests Between Debtor and the Released Parties</u>

The first *Dow Corning* factor asks whether there is an identity of interests between the debtor and the non-debtors being released. Although this factor is often established by way of an indemnity relationship, courts have found that an identity of interests exists when continued litigation against non-debtors threatens to deplete the assets of the debtor's estate. *Seaside*, 780 F.3d at 1079-80; *In re Cent. Fla. Civ., LLC*, 649 B.R. 77, 82-83 (Bankr. M.D. Fla. 2023).

Although there is no evidence in the record of an indemnity relationship between Debtor and the Released Parties, the record shows that the claims subject to the Releases are effectively the same claims from which Debtor is seeking relief in this bankruptcy case. The arbitration claims filed prior to the Petition Date naming the Wildermuths or other employees of Debtor as codefendants arise wholly from Debtor's business operations.

If Debtor were discharged under a plan that did not include the Releases, these arbitration claims could, and likely would, continue against the Wildermuths and other Released Parties despite Debtor's discharge from liability. And additional claims could be brought against the Wildermuths and other Released Parties through new arbitration demands. Arbitration demands that only named Debtor as of the Petition Date could also be amended to include the Released

Parties. In all these instances, the claims would arise from the Released Parties' ownership of or employment with Debtor, making Debtor and its records essential to the proceedings.[8]

If these claims moved forward against the Released Parties, Debtor would have obligations and costs associated with the litigation, further depleting Debtor's assets. The threat of such depletion is sufficient to establish an identity of interests. *See Seaside*, 780 F.3d at 1079-80 (finding an identity of interest existed between the debtor and the released non-debtors because continued litigation against the non-debtors "would deplete [the debtor's] assets").

Courts have also found an identity of interests between debtors and released non-debtors when they "share a common goal" of confirming the debtor's plan and implementing a plan settlement. *In re Tribune Co.*, 464 B.R. 126, 187 (Bankr. D. Del. 2011). The Wildermuths managed Debtor throughout this case without pay and were actively engaged in formulating the Plan. Under the Plan, the Releases are not effective until after the Wildermuths have paid the Contribution and Debtor has consummated the Plan. Accordingly, the Court finds that Debtor and the Released Parties share a common goal in seeing both the Settlement and the Plan succeed. For these reasons, the Court finds that an identity of interests exists between Debtor and the Released Parties sufficient to weigh in favor of granting the Releases.

---

[8] The Georgia statute applicable to the type of claims from which the Released Parties primarily seek relief make employees or owners of a company liable jointly with the company for the company's liability. *See* O.C.G.A. § 10-5-58. Thus, the company must be found liable for any employee or owner to be found jointly liable. There is no evidence in the record suggesting that any Releasing Party holds a claim against a Released Party that is not based upon Debtor's underlying liability on the claim.

## ii.  The Released Parties Have Made a Substantial Contribution

The second *Dow Corning* factor considers whether the released non-debtors have made substantial contributions to the plan.[9] Courts look not only to the monetary contribution to a debtor's plan, but also to non-monetary or unliquidated contributions when weighing this factor.[10]

The UST argues that "it is unclear whether the assets that the Wildermuths propose to contribute to the Plan can be considered substantial" because they have not "provided the financial disclosures nor devoted all their assets to the estate as would have been required had they filed their own bankruptcies." Objection at 9. This argument suggests that in weighing this factor, courts should ignore, or at least deprioritize, whether the contribution is "substantial" relative to the claims against a debtor's estate and instead determine whether a non-debtor's contribution is "substantial" relative to the non-debtor's assets. Although the UST cited no authority for this proposition, the Court acknowledges that some courts have considered the released non-debtor's assets in determining whether the proposed contribution was "substantial."[11] This minority

---

[9] This factor asks whether a substantial contribution has been made towards the debtor's "reorganization." Debtor here is liquidating, not reorganizing. Some courts have questioned whether nonconsensual third-party releases "even have a place in Chapter 11 liquidation cases." *In re Stein Mart, Inc.*, 629 B.R. 516, 526 (Bankr. Fla. M.D. 2021). While there may be valid concerns in granting such releases freely in liquidation cases, liquidation is a common and legitimate use of Chapter 11. The use of the term "reorganization" in *Dow Corning* does not, by itself, exclude the use of nonconsensual third-party releases in Chapter 11 liquidation cases. "While 'reorganization' is not a statutorily defined term, it is generally understood to include all types of debt adjustment, including a sale of assets, piecemeal or on a going concern basis." *United Mine Works of Am. Combined Benefit Fund v. Toffel (In re Walter Energy, Inc.)*, 911 F.3d 1121, 1156 (11th Cir. 2018) (quoting *In re Family Snacks, Inc.*, 257 B.R. 884, 895 (B.A.P. 8th Cir. 2001)). "If the plan of liquidation ensures the best possible outcome for unsecured creditors and the releases therein are critical to confirmation of the plan, then the fact that the case is not a reorganization should not per se prohibit confirmation of the plan." *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 520 (Bankr. Mo. E.D. 2012).

[10] *Seaside*, 780 F.3d at 1080 (affirming the bankruptcy court's finding that "the contribution of [released non-debtors'] services to the reorganized entity is the very 'life blood of the reorganized debtor'"); *In re TOUSA, Inc.*, 2013 Bankr. LEXIS 3169 (Bankr. M.D. Fla 2013) (finding that the released non-debtors "provided substantial consideration" to the debtors' estate "by compromising aspects of their asserted [c]laims or other legal and/or equitable rights" in reaching a settlement); *In re Mercedes Homes, Inc.*, 431 B.R. 869, 880 (Bankr. S.D. Fla. 2009) (finding that the waiver of a deficiency claim by released non-debtors was "a substantial and critical contribution" to the debtor's plan).

[11] *See, e.g., In re HWA Props.*, 544 B.R. 231, 241 (Bankr. M.D. Fla. 2016) ("Courts evaluating this factor have found a contribution to be 'substantial' where the contribution consists of most of the assets of the contributing party."); *In re M.J.H. Leasing*, 328 B.R. 363, 371 (Bankr. D. Mass. 2005) (finding the non-debtors' proposed contribution "insufficient" because "there was no description as to how the amount related to their ability to pay").

position contradicts the bulk of caselaw on this issue, however. When evaluating this factor, courts typically focus on the impact of the non-debtors' contributions on the debtor's estate.[12]

The minority position would impose a burdensome duty on courts to demand financial disclosures from non-debtors and assess the value of non-bankruptcy assets to determine whether a contribution is substantial. That costly endeavor may be appropriate if the question before the court were whether a non-debtor's contribution sufficiently punishes the non-debtor. But sufficient punishment of plan contributors is not a prerequisite to plan confirmation. Bankruptcy courts are courts of equity with considerable latitude to fashion relief for the parties before it. But the bankruptcy system is designed to solve the problem of allocating limited resources, not to punish wrongdoers. This Court will therefore take the pragmatic approach, not the punitive one. Focusing on whether the Contribution makes a critical impact on the Plan and creditors' ability to recover aligns with the purpose of the Bankruptcy Code. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984) ("[T]he Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering [] equities. The Bankruptcy Code does not authorize freewheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization."), *superseded by statute on other grounds*, 11 U.S.C. § 1113.

The impact here is substantial. After months of mediation and negotiations between parties represented by competent legal counsel, and the Wildermuths' production of personal financial information to the Settling Creditors, the Settling Creditors agreed to support the Plan in exchange for the $1.3 million Contribution by the Wildermuths. The Contribution will increase funds

---

[12] *See, e.g., Purdue Pharma*, 69 F.4th at 81 ("When evaluating the substantial nature of the released parties' contribution, our primary focus is on the impact of the financial contribution."); *In re Cent. Fla. Civ., LLC*, 649 B.R. at 83 (finding the released non-debtors' contributions substantial in part because it "nearly double[d] the projected monthly payments to unsecured creditors."); *In re Master Mortgage Inv. Fund*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994) (finding the released non-debtors' contribution substantial because it "allowed for a distribution to other creditors").

available for distribution to creditors from $800,000 to $2.1 million—a 162% increase. Of this $2.1 million, the Plan estimates approximately $1,175,000 will be made available to Class 2 general unsecured claims, the vast majority of which are non-settling arbitration claimants. The remaining $1 million will be allocated to the Settling Creditors in Class 3, all of whom voted in favor of the Plan and have agreed to forgo any further distribution from Debtor's estate assuming the Plan is confirmed. This will reduce the aggregate claims against Debtor's estate from approximately $11,550,000 to approximately $4,448,000, drastically increasing the percentage payout to Class 2 creditors from approximately 7% of the face value of claims filed to 25%, and potentially between 31% and 36% after accounting for anticipated negotiated claim reductions.[13] *See* Doc. 113, p.7, Doc. 93, § 5.2 and Exh. A.

In addition to the financial Contribution, the Wildermuths have been vital to Debtor's case by managing Debtor throughout this bankruptcy process without pay. Given the substantially increased recovery for Debtor's creditors resulting from the Contribution as well as the Wildermuths' non-monetary contributions to Debtor throughout this case, the Court finds the Wildermuths' contributions to the Plan are substantial and weigh in favor of granting the Releases.[14]

---

[13] At the Confirmation Hearing and in his *Report of Subchapter V Trustee* (Doc. 113), Todd Hennings (the "Subchapter V Trustee") explained that some creditors filed claims asserting the full amount of their total investment with Debtor, not taking into account distributions previously received on those investments or the existing value of the investments. The Subchapter V Trustee has undertaken the process of negotiating with these creditors to reduce their claims accordingly.

[14] The Released Parties include not only the Wildermuths, but also any of Debtor's current or former officers, directors, and employees, and any entities affiliated with or related to Debtor or the Wildermuths. While the Wildermuths are the only Released Parties providing a financial contribution to the Plan, the record at the Confirmation Hearing established that the Contribution will be made on behalf of all Released Parties and that the Wildermuths are unwilling to fund the Plan absent the release of all Released Parties. Their justification for this insistence is that (i) more than one of Debtor's former employees has had arbitration claims brought against them arising from Debtor's business, and (ii) the inclusion of entities related to the Wildermuths in the Releases guarantees that the Wildermuths will not be subject to further litigation for claims arising from or in connection with Debtor's business. The Wildermuths also argued that the income they generated from their related entities would help ensure they meet their financial obligations under the Plan and that the threat of litigation would jeopardize that income source. Although "[n]ot every

iii.  <u>The Releases are Essential to the Plan</u>

The third *Dow Corning* factor considers whether the injunction is essential to the debtor's plan. The UST argues that the Releases are not essential because the Plan could be confirmed without the Releases. The Court disagrees. To confirm a Plan without the Releases, Debtor would have to propose a vastly different plan[15] subject to creditors' objections. The Settling Parties have indicated they would not support the Plan absent the Contribution, and the Wildermuths have made it clear they would not make the Contribution to the Plan absent the Releases. Without the Contribution, there would be approximately $800,000 available for distribution to creditors instead of the $2.1 million contemplated by the Plan. Moreover, the record establishes that absent the Releases, Debtor would object to and litigate the creditors' unliquidated arbitration claims, initiating a lengthy claims objection process to resolve over $11 million in claims, further depleting the funds available for distribution.

The additional $1.3 million for Debtor's creditors and the savings Debtor's estate garners by avoiding the cost of further litigation are essential to reaching a confirmable plan. No plan has been proposed without the Releases, and without the Releases there will be no Contribution. Without the Contribution, distributions would be greatly diminished, and the Settling Creditors and other voting creditors will not support a plan with *de minimis* distributions. The Releases are the keystone of the Plan; removing the Releases from the Plan will result in the entire Plan—and

---

[] released party is necessarily going to make a specific payment under the plan," the Court finds that "the relationships among the [] released parties are sufficiently close to lead to the conclusion that the aggregate settlement payment hinges on each being released." *See In re Purdue Pharma L.P.*, 633 B.R. 53, 107 (Bankr. S.D.N.Y. 2021), *vacated*, 635 B.R. 26 (S.D.N.Y.), *aff'd in part, rev'd in part, Purdue Pharma*, 69 F.4th 45.

[15] This case was filed under Subchapter V of the Bankruptcy Code meaning only Debtor may propose a plan, unlike a "regular" Chapter 11 case in which creditors may propose a plan. *Compare* 11 U.S.C. § 1189(a) *with* 11 U.S.C. § 1121.

likely Debtor's Chapter 11 case—falling apart. Accordingly, the Court finds that the Releases are essential to Debtor's Plan, weighing in favor of granting the Releases.

#### iv.  Impacted Classes Overwhelmingly Voted to Accept the Plan

The fourth *Dow Corning* factor asks whether the impacted class or classes have overwhelmingly voted to accept the plan. The Releases were narrowly tailored to impact only creditors in Classes 2 and 3, both of which voted to accept the Plan. But the UST argues that the voting tally does not account for the remaining creditors that did not vote to accept the Plan and did not participate in the mediation. Objection at 14.

As previously stated, 17 of the 38 eligible voters in Class 2 voted to accept the Plan, while the remaining 21 did not submit a ballot. Of those 21 Class 2 creditors, eight were entities not subject to the Releases and one ultimately withdrew their claim.  Of the remaining 12 non-voting creditors, 11 of which were represented by legal counsel, none has asserted a claim against any of the Released Parties. Meanwhile, all Class 3 creditors voted to accept the Plan. This means *all* creditors with known claims against the Released Parties voted to accept the Plan.

The non-voting creditors were afforded sufficient notice of their ability to vote against or object to the Plan and an opportunity to be heard. They were silent. The creditors who chose to be heard spoke unanimously in support of the Plan. That not every creditor voted on the Plan is unremarkable; the Court seldom sees the entire creditor body affirmatively participate in the voting process by returning a ballot.

Thus, the Court finds that the impacted classes overwhelmingly voted in support of the Plan, and this factor weighs heavily in favor of granting the Releases.

v.  <u>The Plan Provides Substantial Distributions to All Affected Classes</u>

The fifth *Dow Corning* factor considers whether the plan provides for a mechanism to pay all, or substantially all, of the affected classes. Here, the claims affected by the Releases are mostly made up of unliquidated FINRA litigation or arbitration claims. In his Subchapter V Trustee's Report and at the Confirmation Hearing, the Subchapter V Trustee indicated that he had resolved some potential claims objections, reducing Debtor's unsecured debt by a substantial amount, and would continue to undertake such efforts. *See* Doc. 113, p. 7; Doc. 93, § 5.2 and Exh. A. As previously noted, these efforts, along with the Contribution, will increase the payout on the *face amount* of the total claims filed in the case from 7% to between 31% and 36%. *Id.*

Ms. Wildermuth's uncontroverted testimony is that there are meritorious defenses to the unliquidated litigation and arbitration claims. Ms. Wildermuth further testified that based upon Debtor's "net out of pocket" valuation[16] of the unliquidated claims, the estimated distributions under the Plan (now 31%-36% of the face value) would be sufficient to pay all or substantially all ultimately allowed claims (the "net out of pocket" value) in full. No party has objected to Debtor's valuation method or proposed any alternative method for valuing the claims.

With no opposition by any party affected by the Releases and no evidence to the contrary, the Court finds that Debtor's valuation of the unliquidated litigation and arbitration claims is fair. And after anticipated claim reductions, the Plan will provide for the payment of substantially all, if not all, the claims affected by the Releases. Thus, the Court finds that this factor also weighs in favor of granting the Releases.

---

[16] Debtor's net out of pocket valuation of the claims fixes the claim value at the amount lost on a particular investment less the remaining value of the investment.

vi. <u>No Alternative for Those Claimants Not Settling to Recover in Full</u>

The sixth *Dow Corning* factor asks whether the plan provides for an opportunity for claimants who choose not to settle to recover in full. The Plan provides no such opportunity. Nevertheless, the lack of alternative means of recovery is not critical in this case. The Releases here are limited to causes of action relating to Debtor. Debtor's vendors, contract counterparties, and former customers, among others, were provided with an opportunity to file a claim in this case as well as notice of the Plan and the Releases contained therein. No party in interest other than the UST objected to the Plan or the Releases contained therein, nor has any creditor sought an "opt out" mechanism to carve themselves out of the Releases. Debtor does not appear to have any unknown creditors or potential future claimants not yet aware of their claims against the Released Parties. And no party, including the UST, offered evidence indicating a hypothetical unknown or future claimant could exist relative to Debtor or the Released Parties within the scope of the Releases. Even though this factor weighs against approving the Releases, given the facts specific to this case, the failure to meet this factor alone is insufficient to render the releases inappropriate. *See Seaside*, 780 F.3d at 1079 ("[B]ankruptcy courts should have discretion to determine which of the *Dow Corning* factors will be relevant in each case.").

vii. <u>Specific Factual Findings Support the Court's Conclusions</u>

This Memorandum Opinion constitutes the Court's specific factual findings supporting its approval of the Releases, thus satisfying this factor.

D. *<u>Other Factors</u>*

i. <u>Fairness and Equity</u>

Eleventh Circuit precedent encourages courts to consider other relevant factors when determining whether to grant a nonconsensual third-party release. The *Seaside* Court, for example,

looked to its prior precedent in *Munford* to evaluate whether the plan was "fair and equitable" under the facts and circumstances. *Seaside*, 780 F.3d at 1081 (citing *Munford v. Munford (In re Munford, Inc.)*, 97 F.3d 449, 455 (11th Cir. 1996).

This Plan is the result of extended negotiation and mediation. Sophisticated investors represented by competent counsel arrived at a figure that would address their concerns and that the Wildermuths were able to pay. Those creditors who chose to vote did so unanimously in favor of the Plan. The alternative to confirmation of the Plan is extended litigation for all involved. While such a result may lend clarity to the validity of creditors' claims, it will cause a significant diminution in recovery for Debtor's creditors due to the depletion of estate assets. The Court thus finds that the Plan is fair and equitable.

### ii. Consensual Resolution Supported by the Subchapter V Trustee

Debtor filed this case under Subchapter V of Chapter 11 of the Bankruptcy Code, which is specifically and intentionally designed to encourage consensual resolutions between a debtor and its creditors. *See, e.g.*, 11 U.S.C. § 1188(c) (requiring a Subchapter V debtor to file a report that "details the efforts the debtor has undertaken and will undertake to attain a consensual plan of reorganization"). This statutory purpose is further evidenced by the Subchapter V trustee's unique duty to "facilitate the development of a consensual plan of reorganization." 11 U.S.C. § 1183(b)(7). Here, Debtor has achieved the purpose of Subchapter V by reaching a consensual resolution with its creditors. Moreover, Debtor has done so with the aid and approval of the Subchapter V Trustee, as evidenced by the Subchapter V Trustee Report and the Subchapter V Trustee's statements on the record at the Confirmation Hearing. The Court finds that the consensual nature of the Plan as

well as the Subchapter V Trustee's endorsement are relevant factors that weigh in favor of confirmation of the Plan and granting the Releases therein.

### iii.  The *Purdue Pharma* Factors

In its recent *Purdue Pharma* opinion, the Second Circuit adopted its own seven-factor test for bankruptcy courts to evaluate nonconsensual third-party releases. These factors are essentially the same as the *Dow Corning* factors analyzed above, with some differences. The *Purdue Pharma* decision is now before the Supreme Court[17] and in anticipation of its ruling, the Court will expand its analysis under the *Purdue Pharma* factors.

Factors one and two look to the identity of interests between the debtor and released parties and whether claims against the debtor and non-debtors are legally intertwined. *Purdue Pharma*, 69 F.4th at 78. The Court undertook this analysis under the first *Dow Corning* factor and found that it weighed in favor of approving the Releases.

The third *Purdue Pharma* factor looks to whether the scope of the releases is appropriate, considering whether its "breadth" is "necessary to the [p]lan." *Id.* (internal citation omitted). Closely related is the fourth factor, which looks at whether the releases are essential to the plan's success. *Id.* The Court addressed these factors in its analysis of the third *Dow Corning* factor and found that the Releases were undoubtedly essential to the Plan's success. The Releases were narrowed through arms-length negotiations with creditors and further narrowed during the Confirmation Hearing at the Court's behest. Accordingly, the Court finds these factors to weigh in favor of approving the Releases.

The fifth *Purdue Pharma* factor, like the second *Dow Corning* factor, looks to whether the non-debtor contributed substantial assets to the reorganization. *Id.* Likewise, the sixth *Purdue*

---

[17] *Purdue Pharma, L.P.*, 2023 U.S. LEXIS 2872.

*Pharma* factor, like the fourth *Dow Corning* factor, looks to whether the impacted creditors voted overwhelmingly in favor of the plan with the releases. *Id*. The Court's analyses of the second and fourth *Dow Corning* factors are therefore equally applicable to these *Purdue Pharma* factors and weigh in favor of approving the Releases.

The seventh *Purdue Pharma* factor looks to whether the plan provides for the fair payment of claims. *Id.* This factor is more akin to the Eleventh Circuits "fair and equitable" analysis from *Munford* than to the fifth *Dow Corning* factor looking to whether the plan pays all or substantially all of the claims of the affected classes. The Court's analysis of both the *Munford* fair and equitable factor and the *Dow Corning* substantial payment factor are relevant to this *Purdue Pharma* factor, and for the same reasons the Court finds that the Plan provides for the fair payment of claims.

## IV. <u>Conclusion</u>

The Court concludes that the Releases contained within the Plan are fair, equitable, and in compliance with applicable statutory provisions and Eleventh Circuit caselaw. The Court undertook an analysis of the Releases under both the *Dow Corning* factors and the *Purdue Pharma* factors and reached the same result—the Releases are appropriate, and the Plan should be confirmed. Having determined at the Confirmation Hearing that the Plan meets all other requirements for confirmation, the Court will confirm the Plan by entry of a separate order.

The Clerk shall serve a copy of this Memorandum Opinion on Debtor, the UST, and those parties who have filed a notice of appearance or requested service of pleadings in this bankruptcy case.

**END OF DOCUMENT**